Clint **LEVINGS** et al., Respondents,

v.

John C. **DANFORTH**, Attorney General of the State of Missouri, Respondent,

v.

Ruth C. **GREENE** et al., Appellants,

v.

Robert A. **RANKIN** et al., Intervenors, Respondents.

No. KCD 26193.

Missouri Court of Appeals, Kansas City District.

July 1, 1974.

Walter L. Mulvania, Rock Port, for appellants.

B. J. Jones, Asst. Atty. Gen., Jefferson City, for Atty. Gen.

J. M. Gerlash, Tarkio, for respondent Levings and others.

Bernard Gorman, Tarkio, for respondent Rankin and others.

Before PRITCHARD, P. J., and SWOFFORD and SOMERVILLE, JJ.

SWOFFORD, Judge.

This is an appeal from a judgment in an action brought by testamentary trustees of a charitable trust established under the will of Charles Raymond Carpenter.

The trust provisions of this will provided for the establishment or maintenance of a hospital at Tarkio, Missouri. In the petition the trustees assert that the charitable trust cannot be carried out according to its terms. They ask that the trust be administered *cy pres* and that they be authorized to liquidate the trust corpus (farm, livestock, equipment, etc.), invest the proceeds and hold the same together with the increment thereon until the corpus is sufficient to establish an intensive care unit at an existing hospital at Fairfax, Missouri.

The Attorney General of Missouri is named defendant as the representative of the public in matters pertaining to charitable trusts. Also named as defendants are the heirs at law of Carpenter, the testator, (appellants herein), who assert that the trust has failed and that they, as the heirs at law, are entitled to the trust property. Certain individuals, residents of Tarkio and the Tarkio College were permitted to intervene as interested parties and as representatives of the citizens of that community. These intervenors (and the Attorney General) took the position that the trust has not failed but could be administered *cy pres* and that the Carpenter heirs had no interest in the trust estate. Further, they assert, in opposition to the plaintiff trustees, that the general charitable intent of the testator would not be satisfied by the trustees' proposal that an addition be constructed to the Fairfax Community Hospital, Fairfax, Missouri, but could and should be accomplished by the creation of a medical facility at Tarkio.

A trial was had before the court, sitting as a chancellor in equity, and a judgment was entered in which it was decreed that the testator had a general charitable intent to provide medical treatment facilities at Tarkio, Missouri; that this general intent was not impossible of performance and the trust has not failed; that the Carpenter heirs have no interest in the trust corpus; that liquidation of the corpus for the purpose suggested by the trustees was not practical nor within the general intent of the testator; that the trustees were to continue to operate the trust, under the continuing jurisdiction of the court, until sufficient funds are accumulated to provide a medical treatment facility at Tarkio; and

that the trustees make annual reports to the court and to the Attorney General as to the administration and status of the trust. The judgment also made allowances for trustees' and attorneys' fees payable from the trust funds, which allowances are not challenged nor involved in this appeal. The heirs at law appeal from this judgment. We affirm.

The *cy pres* doctrine is one of ancient origin based upon the great concern of equity to protect and preserve charitable bequests. Its literal meaning is "as nearly as" (possible). It is a favorite of equity and its basic principles are thus stated in Restatement (Second) of Trusts, Section 399 (1959):

> "If property is given in trust to be applied to a particular charitable purpose, and it is or becomes impossible or impracticable or illegal to carry out the particular purpose, and if the settlor manifested a more general intention to devote the property to charitable purposes, the trust will not fail but the court will direct the application of the property to some charitable purpose which falls within the general charitable intention of the settlor."

This doctrine is discussed in 4 Scott, Trusts, Section 399, at 3084 et seq. (3d ed. 1967), and Bogert, Trusts and Trustees, Chapter 22 (2d ed. 1964).

The *cy pres* doctrine is firmly established in Missouri decisional law. Thatcher v. Lewis, 335 Mo. 1130, 76 S.W.2d 677, 682 (1934); First National Bank of Kansas City v. Jacques, 470 S.W.2d 557, 561 (Mo.1971); Ramsey v. City of Brookfield, 361 Mo. 857, 237 S.W.2d 143 (1951); Reed v. Eagleton, 384 S.W.2d 578 (Mo.1964).

The court below properly applied the *cy pres* doctrine to the Carpenter testamentary trust. In so doing, there were two principal considerations: *First,* was the trust provided in the Carpenter will impossible or impracticable of performance; and *second,* if so, did Carpenter evince a general charitable intent relating to medical care and treatment facilities in Tarkio, Missouri so as to call into application the *cy pres* doctrine so that his specific trust provisions could be accomplished "as nearly as" possible?

To answer these questions we must first examine the basic expression of this intent as contained in the Carpenter will, here in question, and dated November 17, 1966.

In the second clause of this will, Carpenter bequeathed to his daughter, Ruth C. Greene, (one of the appellants herein) a farm, absolutely and in free simple. In the third clause of his will, he bequeathed to his son, Charles Martin Carpenter, (now deceased) a life estate in other farm property. In this bequest he directed that so much of the income from the farm as was necessary be used for the education of his grandsons, Steve Carpenter and Philip Carpenter (appellants herein) and that upon the death of Charles Carpenter said grandsons were to inherit the land in equal shares and in fee simple.

Carpenter then directed that his home in Tarkio, Missouri be sold and that all personalty and investments be liquidated, the taxes, debts and costs of administration be paid, and that the residue of his estate be set up in the trust, which in pertinent part provides:

> "*Sixth*: All of the rest residue and remainder of my Estate, I give, devise and bequeath to the governing body of the Tarkio Methodist Church, Tarkio, Missouri in trust for the following purposes:
>
> (1) The income to be used for the operation and maintenance of a hospital in Tarkio;
>
> (2) Should there be no hospital in Tarkio, then the income from said farming enterprise shall be accumulated by said governing body and invested in first grade securities until such fund shall be sufficient to build a hospital, after the

erection of same, the farm income shall be used toward the operation and maintenance of same;

(3) If there is any indebtedness against said property at the time of my death, then the income therefrom shall be used to pay said indebtedness after which the income shall be used for the purposes herein set forth;

(4) I direct that the pasture land never be plowed and that all plowing be limited to creek and bottom land;

(5) I further direct that the corpus of said trust property, whether real or personal, be maintained to the end that funds be available for the purposes herein set forth;

\* \* \* "

Carpenter died December 21, 1967 and in the order of final settlement and distribution of his estate, dated April 1, 1969, his trustees named in the Sixth clause of his will received 1000 acres of farm land all in Atchison County, Missouri, $9360.00 in cash and other personal property (livestock and machinery) valued at $37,869.00. The farm was encumbered by a mortgage.

For the purposes of this appeal, certain basic facts are to be accepted. At the time of Carpenter's death (and apparently at the time of the submission of this case to us) there was no hospital in Tarkio, Missouri so that, if the trust was to become specifically effective, such could be accomplished only under clause Sixth (2) of the Carpenter will, which provides, under such circumstances, for the construction of an entirely new hospital facility.

Under the facts in the record before us, is such a goal impossible or impracticable? It is clear from the record that it would be impracticable to construct a new full-facility hospital in Tarkio from the Carpenter trust. Indeed, it appears that all parties are in substantial agreement on this basic and realistic fact.

Max Van Hoozer, the executor of the Carpenter will and farm manager em-ployed by the Trustees, testified that the value of the 1000 acre farm was approximately $300.00 per acre and that there was a mortgage against it in the "round figure" balance due of $45,000.00 held by the Federal Land Bank; that the net income from the first year of trust operation was $18,000.00 and for the second, $5,000.00; and that the reasonable expected net income would be from $160.00 to $250.00 per acre, i. e. $16,000.00 to $25,000.00 per year.

Gerald D. Woods, Director of the Bureau of Hospital Construction for the State of Missouri, testified that the cost of building a new hospital was between $30,000.00 and $50,000.00 *per bed,* and that in order to qualify for any federal funding a minimum of 30 beds was required for new construction. With the most efficient farm operation and wise investment of surplus, it would take more than a quarter of a century to accumulate sufficient funds from the Carpenter trust to undertake such a project. It thus appears that it is impracticable, if not impossible, to carry out exactly the terms of the Carpenter trust.

But it is suggested that the funds from the trust could be combined with financing from other sources to build a Tarkio hospital. However, the evidence before us is undisputed that such a program would not only be impracticable but such hospital enterprise would be doomed to failure.

Doris Wells, the manager of the Fairfax Community Hospital at Fairfax, Missouri, also in Atchison County, testified that such facility was approximately 8 miles from Tarkio and that about one-third of the patients at Fairfax Hospital were residents of Tarkio. She stated that the average percent occupancy of the hospital beds was 60%. The medical staff at Fairfax Hospital consisted of two doctors from Tarkio, two from Rockport, and one from Mound City, and while there was a need for more doctors, the Fairfax facility was presently adequate for the care of the patients from all of the surrounding communities. She further testified that an average 75% occupancy was necessary for the hospital to

stay in the black and that if the Tarkio patients had a hospital in Tarkio and quit using the Fairfax facility, it would "go broke".

Mr. Gerald Woods, Director of the Bureau of Hospital Construction for Missouri, testified that the Fairfax Hospital presently has 86 beds but is licensed for only 79, and that its application for license for the coming year was for only 73 beds. The official survey for the area shows the need for 81 hospital beds. Woods further stated that a 60% occupancy rate is the break-even point for hospital operation. He stated that it was his opinion that there was no need for another hospital facility in the service area; that another hospital in Atchison County could not be properly staffed and if such was constructed the occupancy level of both would fall below an operable level and both would face extreme financial difficulties and possible bankruptcy. Both Mrs. Wells and Roger Vanderboom testified that the monthly operating expense of the Fairfax Hospital was from $60,000.00 to $70,000.00.

It has been suggested that funds from the Carpenter trust could be used to establish an intensive care unit at the Fairfax Hospital, but the evidence showed that such a unit was already established and in use at Fairfax. Such a project would also lack a practicable purpose.

 In the light of this undisputed evidence, it is apparent that it was both impossible and impracticable to carry out the terms of the trust strictly in accordance with its terms and conditions. Reed v. Eagleton, supra. Under such circumstances, the court below, as a court of equity, has the power (and, indeed, the duty) to apply the *cy pres* doctrine and seek to determine "as nearly as may be" the general purpose and intent of the settlor and adopt a plan or "scheme" to carry such general intent into fruition and thus prevent a failure of the charitable trust. Restatement (Second) of Trusts, Section 399 (1959). First National Bank of Kansas City v. Jacques, supra; Bank of Delaware v. Buckson, 255 A.2d 710, 717 (Del.Ch. 1969). Before an equity court can exercise this awesome power, there are three generally accepted requirements that must be met: *First,* the trust in question must be a valid charitable trust; *second,* it must appear impracticable or impossible to carry out the specific terms of the trust; and *third,* the intent of the settlor must be a general charitable intent. First Portland National Bank v. Kaler-Vaill Memorial Home, 155 Me. 50, 151 A.2d 708, 717 (1959).

Thus, it is apparent that the only issue here (relative to the application of the *cy pres* doctrine) is whether or not the settlor, Carpenter, had a *general* charitable intent or if his intent was so specific and inflexible as to permit no other conclusion than that the trust must fail where the stated purposes are impossible or impracticable of fulfillment. Obviously, this task is a difficult one for the equity chancellor. The settlor ordinarily expects that his wishes can be carried out and does not contemplate failure. 4, Scott, Trusts, Section 399.2 (3rd ed. 1967). But the object of his bounty may remain clear although the *means* to accomplish it are shown to be impossible or impracticable. The basic equitable problem is, what would Carpenter desire if he knew that his trust purposes could not be carried out? Would he have wished the trust to fail and his heirs at law to succeed to the corpus by inheritance or would he have wished the chancellor to adopt a plan to accomplish, *cy pres,* his general charitable intent? Ramsey v. City of Brookfield, supra; Thatcher v. Lewis, supra.

Of certain elements affecting this problem we can be sure. The settlor, Carpenter, recognized his daughter, son and grandsons, his only heirs at law, by specific substantial bequests in his will and he made no provision for the reversion to them of the corpus of the trust if its purposes failed. Bogert, Trusts and Trustees, Section 437 (2d ed. 1964); Ramsey v. City

of Brookfield, supra; Miller v. Mercantile-Safe Deposit and Trust Co., 224 Md. 380, 168 A.2d 184, 189–190 (1961). He was clearly interested in having a substantial part of his estate used for the battle against sickness, disease and old age by means of a medical facility in Tarkio, Missouri. While he sought to do this by the creation of a hospital, there is no substantial evidence that, if this could not be done, he would thereupon have abandoned any use, less than his ambition, toward medical benefit to his home town.

A will introduced in evidence below and executed by Carpenter in September, 1965 provided for the residue of his estate to go to trustees and specifically declared his desire that the funds be used to establish, "operate and maintain a rest home in the City of Tarkio for elderly people or people in need of a rest home."

Ruth C. Greene, settlor's daughter, testified that Carpenter told her two days before his death that he was going to build a hospital in *Tarkio, Missouri* to be known as the "Carpenter Hospital"; that he expected to build this before his death; and live there when he became too old to care for himself. If nothing else emerges clearly from this record as to Carpenter's general intent, two things are etched with unmistakable emphasis. He felt he had adequately provided for his family and he was fixed upon the idea of providing a medical facility at *Tarkio*. That his dreams were too optimistic, that his testamentary means too inadequate; that his ambitions "could not be realized" in no way destroys or diminishes his general purpose or intent. Namely, to furnish to the citizens of Tarkio, Missouri some theretofore lacking medical facilities.

Claudine Supermaw, Public Health Nurse for Atchison County, Missouri, testified that this program was in need of funds and there are many other possible areas where the funds derived from the Carpenter trust can or may be used to accomplish his general charitable intent. The question of the form that this charity should take (i. e. clinic, health center, nursing home, county health program, or whatever) is better left to the chancellor below who will retain continuing jurisdiction over the trust and will decide such problems upon proper evidence as may be presented to it from time to time. Restatement (Second) of Trusts, Section 399, Comment (d) (1959).

We, therefore, affirm the judgment and decree of the court below, except for the following matter.

The defendants-appellants, heirs of Carpenter, assert that it was error for the court to allow attorneys' fees payable from the trust to counsel for the intervenors. We agree.

The intervenors were citizens of Tarkio, permitted to intervene, to uphold the Carpenter will under *cy pres*. They, of course, were represented by counsel. Appellants claim that intervenors were not necessary parties to the proceedings; that their participation (and that of their counsel) was not beneficial to the trust; and that the allowance of attorneys' fees to them after the Notice of Appeal was filed, was improper. We adopt this position because of the timing involved.

The intervenors' motion for allowance of attorneys' fees was filed on February 10, 1972 and, after the overruling of their motion for a new trial on April 24, 1972, the appellants (heirs) filed a Notice of Appeal to this court on May 4, 1972. *Thereafter* and on May 31, 1972, the court below conducted a hearing and awarded intervenors an attorneys' fee. The court below did not have jurisdiction to make this order.

The filing of the Notice of Appeal on May 4, 1972 divested the court below of any jurisdiction to perform any *judicial* functions. All the jurisdiction that remained in the court below thereafter was to perform whatever ministerial or executive functions specifically imposed by statute or rule. Gieselmann v. Stegeman, 470 S.W.2d 522, 524 (Mo.1971); State ex rel. Williams v. Daues, et al., 334 Mo. 91, 66

S.W.2d 137 (banc 1933); Herrick Motor Co. v. Fischer Oldsmobile Co., 421 S.W.2d 58 (Mo.App.1967). The allowance of attorneys' fees to counsel for intervenors is not an authority thus specifically granted. We, therefore, hold that this allowance was unauthorized and made without jurisdiction. In so holding, we do not decide that some allowance for this purpose is improper but simply that the court below had no jurisdiction to make the order on May 31, 1972, after appeal by the Carpenter heirs. The court below, under its continuing equitable jurisdiction over the Carpenter trust, may wish to again consider this facet of the case, when its jurisdiction is restored by our mandate herein.

For the reasons herein stated, the judgment of the court below is affirmed in all particulars except that part thereof which allows Bernard Gorman, attorney for Intervenors, an attorney's fee, which portion of the judgment is reversed. The cause is remanded for further proceedings in accordance with this opinion.

All concur.